IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 1, 2020

IN RE ALLYSON P.[1]

Appeal from the Juvenile Court for Blount County
No. JV-1085          Kenlyn Foster, Judge

_____

No. E2019-01606-COA-R3-PT

_____

A mother's parental rights to her daughter were terminated on four grounds and on the trial court's finding that termination was in the child's best interest. Upon our review, we conclude that the record does not support the court's determinations with respect to two of the grounds or the holding that termination of the mother's rights was in the best interest of the child. While we affirm two of the grounds upon which the court terminated Mother's rights, our reversal of the holding that termination of the mother's rights was in the child's best interest requires that the judgment be reversed and the petition dismissed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed in Part and Reversed in Part; Petition Dismissed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which KENNY W. ARMSTRONG, J. joined. D. MICHAEL SWINEY, C.J., filing a separate concurring and dissenting opinion.

Brennan M. Wingerter, Knoxville, Tennessee, for the appellant, Amanda P.

Herbert H. Slatery, III, Attorney General and Reporter; and Jeffrey D. Ridner, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.     FACTUAL AND PROCEDURAL HISTORY**

Amanda P. ("Mother") and Jonathan W. ("Father") are the parents of Allyson P. ("the Child"), who was born in May of 2012. On January 12, 2018, while driving with

_____

[1] This Court has a policy of protecting the identity of children by initializing the last names of the parties.

the Child and the Child's younger half-sister in the car, Mother was stopped by the police; in the course of the stop, the officer found methamphetamine in Mother's possession and in one of the children's toys, resulting in Mother's arrest and the children being placed in the protective custody of the Department of Children's Services ("DCS"). On January 18, DCS filed a petition in the Blount County Juvenile Court to have the children adjudicated dependent and neglected due to their exposure to drugs at the hands of Mother, and seeking temporary legal custody; the court granted DCS custody that day.[2] A permanency plan was created on February 9, with the dual goals of "return to parent" and "exit custody with relative"; the plan was duly ratified by the court. On April 13, Mother pled guilty to felony possession of methamphetamine and was sentenced to ten years imprisonment, with 123 days of her sentence to be served in the Tennessee Department of Corrections and the remainder to be served in Community Corrections.

A hearing was held on November 8, at which both children were adjudicated dependent and neglected. On the same day, a second permanency plan, which had been prepared in July, and which contained the same goals as the original plan, was ratified. Following a hearing on March 12, 2019, the court found that the children were severely abused within the meaning of Tennessee Code Annotated section 37-1-102(b)(27)(A)(i) based on the following findings:

> [D]ue to mother's testimony that meth was found on Mother's person and in Ally's belongings the night she was arrested in Jan 2018 while the child was not properly restrained; mother's testimony that meth was dangerous to the children; mother knowingly moving the children into a residence of an active meth smoker and knowingly leaving the children in the care of a meth user; the court found mother's testimony that she didn't know the children were exposed to meth not credible.

DCS filed a petition to terminate both Mother's and Father's rights to the Child on April 1, 2019. With respect to Mother, the petition alleged the following grounds for termination: abandonment by failure to provide a suitable home (Tennessee Code Annotated §§ 36-1-113(g)(1) and 36-1-102(1)(A)(ii)); abandonment by engaging in conduct prior to incarceration that exhibits a wanton disregard for the Child's welfare (§§ 36-4-113(g)(1) and 36-1-102(1)(A)(iv)); persistence of conditions (§ 36-1-113(g)(3)); and severe child abuse (§ 36-1-113(g)(4)). The petition alleged that termination was in the Child's best interest. Father surrendered his rights to the Child on May 6, and his rights are not at issue in this appeal.

---

[2] The petition was later amended to allege that, due to the Child's half-sister's drug screen testing positive for amphetamines and methamphetamines, Mother had committed severe child abuse.

## II. THE TRIAL

Trial was held on July 26, at the beginning of which counsel for DCS announced that DCS would also be seeking to terminate Mother's rights on the ground of failure to manifest an ability and willingness to assume custody of the Child. Four witnesses testified: Angela Mueller, the DCS case manager; Corey H., foster father; Mother; and Britt Baker, therapeutic visitation supervisor.

Angela Mueller, DCS foster care case manager, testified that she had been the Child's case manager since she came into custody on January 12, 2018, as a result of a traffic stop in which Mother, driving with the children in the car, was found to have three grams of methamphetamine on her person and five grams of methamphetamine in one of the children's toys; that the Child and her half-sister were initially placed in a DCS foster home but were moved to a kinship foster home from February through October 2018; that they were subsequently placed in kinship foster home with Corey H. and his wife; and that Corey H. is the biological father of Barbara P., the Child's younger half-sister.

Ms. Mueller testified that she developed a permanency plan, which Mother signed; that Mother was incarcerated during the first four months the Child was in DCS custody but that she requested, and DCS paid for, a mental health assessment and an alcohol and drug assessment; that Mother completed those assessments and eight hours of individual therapy while incarcerated; that Mother was released from incarceration in April 2018 and was out "about fourteen or fifteen days" when she tested positive for methamphetamine, which resulted in her reincarceration on May 9 for violating her probation; that, during this period of incarceration, Ms. Mueller visited Mother in jail "maybe three times" over the next four months; that between September and December 2018, she maintained contact with Mother; and that Mother was released from incarceration on April 23, 2019, at which point Ms. Mueller set up a parenting assessment and therapeutic visitation with the Child; that Mother "has been on drugs the majority of [the Child's] life" and that the children had previously been removed from Mother's custody in 2016, but that Mother regained custody[3]; that, at the time of trial, Mother was residing at House of Awakenings, a recovery program in which she lives in a trailer with eight other women; and that Mother told Ms. Mueller that she planned to reside with her grandmother upon completion of the program.

Ms. Mueller testified that the Child told her she had witnessed violence that Mother suffered at the hands of Mother's father and his wife, who reside in close proximity to Mother's grandmother. With respect to the foster home in which the Child now resides, Ms. Mueller testified that it is "very family oriented" and "very loving, very nurturing" and that the Child is "at ease there"; that the children are on a schedule; that

---

[3] The testimony of the circumstances of the children's removal in 2016 was not clear and the incident has no bearing on our consideration of the issues in this appeal.

the family is very involved in their church, and the children are involved in cheerleading and gymnastics; and that the Child calls Corey H. "Daddy," his wife "Mama," and calls Mother "Amanda."

Corey H., foster parent of the Child, testified that he has known the Child since she was three months old and that she has lived in his home since October 2018; that she calls him "Daddy" and calls his wife "Mom"; that he and his wife love the Child and intend to adopt her if the Court granted DCS full guardianship of her; that he and his wife have several family members who live nearby and see them at church and who have taken an interest in the lives of both children; that he "tr[ies] to give her a good, Christian, loving home" that is free of violence and yelling; and that the Child has weekly visitation with Mother, whom she calls "Mother."

Corey H. also testified that he had "never actually seen [Mother] do [meth]," but that "people told [him] she was," and that if the Child were to live with Mother in Mother's grandmother's home, he would be concerned about drugs and the Child being exposed to "people that I wouldn't want my children around." With respect to domestic violence, he testified that that Mother and her father would frequently "get in an altercation"; that the Child told him that she had witnessed one altercation when Mother and Mother's father got into a fight and Mother's father threw Mother on the ground and took her cell phone; that his residence is contiguous to Mother's father's home; and that he had been involved in an altercation with Mother's father, resulting in mutual restraining orders being in effect between them.

Mother was 31 years old at the time of trial. She testified that she had been using drugs "on and off" since she was a teenager; that she smoked marijuana "[a]lmost every day" at age 17 until her Mother introduced her to pain pills, which then became her drug of choice; that she started using methamphetamine while living with her Father, and used that drug "a little bit, like on and off for a couple of months" as a teenager; that after she had the Child, she "started going to a Suboxone doctor" and "was on Suboxone for five years"; that she did not abuse Suboxone but was addicted to methamphetamine while taking Suboxone; and that her drug problem "goes back and forth. Like it got worse and then I got clean. And my brother and my uncle got killed [in 2011] and I relapsed"; and that, immediately prior to her arrest in January of 2018, she lived with an individual named Dewan, and they both were using drugs.

Mother testified at length about the treatment for her drug use that she had undergone prior to the date of trial:

Q. . . . How many times have you sought drug treatment?
A. Recovery Court. I went to Kentucky for -- I got pregnant with my kids. Before I had them, I went to the Cumberland Hope Center. I was there for about three months. I came home and I stayed clean. And I got

- 4 -

pregnant with Ally and I stayed clean throughout my pregnancy. And when I left the hospital with her, I relapsed on the pain pills they sent me home with. And when that happened –

*** 

Q. So, after Ally was born, you relapsed on pain pills?

A. Yes. And that was when I went and got on the Suboxone at the Suboxone doctor. And I had been on it all the way up until I got pregnant with [Barbara].

Q. Did you have any relapses during the time you were using Suboxone?

A. No.

Q. Okay. Until the meth, obviously?

A. Yeah.

Mother testified that she was currently residing with six recovering substance abusers in a six-month program called "House of Awakenings"; that the program requires "step work,"[4] Narcotics Anonymous classes, Celebrate Recovery classes, and one-on-one therapy; that she entered the program on April 22, 2019, and would be there until the end of October; that she was in the first of four phases in the program and was about to move up to Phase II; that she would still be under the supervision of the Blount County Recovery Court following her release; that her current living situation was not suitable for a child but that she planned to move in with her grandmother or get an apartment after she completed the treatment program; that it had been "almost fifteen months" since the last time she was under the influence of any illegal drug; and that she had progressed in the following ways:

I just see how I've destroyed everyone, what I've put my kids through, my family through. When I relapsed last time in Drug Court, it was just like as soon as I did it, like I knew – Like I regretted it as soon as I done it. I was just – I'm over it. I'm sick and tired of being sick and tired.

*** 

I'm in Recovery Court. I go to Court every Wednesday with Judge Harrington and she kind of gives us a review and tells us how we're doing. I go to therapy once a week at the Recovery Court office. I go to four NA meetings a week. We attend Celebrate Recovery every week. We do like service work at the house to try to help people. I've been -- I take drug screens twice a week with Drug Court. We have a color line. And you have to call it every day. If your color pops up, you have to go into the office and

---

[4] She did not explain what the "steps" were.

drug test. And I've also took three drug tests I think all together since I've been out for Angie. And I had a Parenting Assessment. . . .

A letter from the program director of the Blount County Recovery Court entered into evidence attested to Mother's participation in the program:

> This letter is to document that Amanda P[.] is participating in the Blount County Recovery Court. Amanda began the six weeks in-jail Stabilization Phase February 25, 2019. She completed this phase, was released from custody and placed at the House of Awakenings on April 18, 2019. Amanda has also completed Phase I and is currently in Phase II.
>
> Each participant is assigned a Case Manager and a Therapist when entering the program. Amanda is currently in compliance with all program requirements, including maintaining full-time employment, attending AN/NA meetings, attending required Recovery Court groups, attending individual therapy sessions, submitting to and passing random drug screens, and attending scheduled court appearances.
>
> Therapeutically, she is attending all scheduled therapy sessions and working on issues related to addiction and family origin issues.
>
> ***
>
> Once the participant completes the four phases of the program, they advance to Aftercare. Aftercare is designed for their continued recovery with support system, more freedom and less monitoring. Quarterly Recovery Court appearances and weekly meetings are required. Aftercare is set for one year but can be extended if deemed appropriate.
>
> Amanda appears dedicated and consistent working for her recovery and to be a productive citizen in h[er] community.

With respect to her criminal history, Mother testified that while she was pregnant with the Child, she was convicted of theft in 2011 for stealing a piece of jewelry because she "was on pain pills really bad." Mother's testimony and the conviction entered into evidence at trial establish that she pled guilty to methamphetamine possession on April 13, 2018 and was sentenced to ten years imprisonment, of which 123 days would be served in the Tennessee Department of Corrections, and then the remaining nine years and seven months served in Community Corrections. Mother testified that after, her release in April 2019, she would be in Recovery Court through April 2021, and that "[i]f [she] graduate[s] Recovery Court and have all my fines paid, they let you off of Community Corrections."

There was not a lot of testimony about Mother's living situation. Mother testified that she had lived with both her grandmother and her father in the past; that when the Child was born in 2012, Mother and the Child lived with Mother's grandmother until 2013; Mother testified that when her father found out about her drug usage, they got into a physical fight, which she described as follows:

> My dad was trying to take my phone away from me. And, of course, that's pretty much a druggie's worst nightmare for him to take your phone away from you. And my dad got my phone and I tried grabbing it. And when I did, like me and my dad both tumbled over. And my stepmom came out there hollering. She was like, "What is wrong with you guys?" And she went to pick me up, like trying to separate me and my dad because I was still trying to get my phone from my dad and she did -- She didn't mean to, but she did scratch me on the neck when she was pulling me up.

Also pertinent to the issues in this appeal is Mother's testimony that her relationship with Corey H. was tumultuous; that in 2015, they were "fighting back and forth" and she was "going to leave because he kept hitting [her]." She also testified that she told him that "if [they] ever split up, . . . [she] wouldn't take [the Child] from his life because they do have a good bond together"; and that [the Child] has "always called [Corey] Dad."

With respect to her relationship with the Child, Mother testified that since she was released from incarceration in April, she has been visiting with the children every week for two hours; that the visits have "been going really good"; that before the first visit, she was "terrified of seeing them the first time," after "being gone from them so long," that "they wouldn't notice me" because she had changed and "put on weight", but that "they came in and came straight to me, you know, like no time had passed"; that both children call her "Mommy"; that she brings markers, coloring books, bubbles, games, and activities that they can do together; that they go outside the restaurant to a fenced-in area, where they blow bubbles, she plays songs on her phone, and the girls will "show [her] their dance and their gymnastics"; and that the girls are affectionate toward her.

Britt Baker, a case manager at Omni Visions who supervised several of Mother's visits, testified that she thought the children had a substantial and meaningful relationship with Mother and that removing Mother from their lives would be "detrimental"; that the visits "went very well"; that the children were "very enthusiastic" and "very happy" to see Mother; that Mother was "enthusiastic," "very warm," and "very attentive" to her daughters at each visit; that Mother "always brought appropriate materials, if that be markers, paper, games. At one point, she brought shoes"; and that the girls called Mother "both Mommy and Amanda" but she thought, based upon things Mother told her, that they were calling her Amanda because they had been coached to do so.

At the conclusion of trial, DCS conceded that it had not proven the ground of persistence of conditions by clear and convincing evidence. The trial court rendered an oral ruling, memorialized in an order entered on August 8, terminating Mother's rights on the grounds of abandonment by failure to provide a suitable home; abandonment by engaging in conduct prior to her incarceration that evidenced a wanton disregard for the Child's welfare; severe child abuse; and failure to manifest a willingness and ability to assume custody of Allyson. The court also held that termination of Mother's rights was in Allyson's best interest. Mother appeals.

### III.    STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). However, that right is not absolute and may be terminated in certain circumstances. *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982); *State Dep't of Children's Serv. v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard of proof when adjudicating termination cases. *Santosky*, 455 U.S. at 766–69. A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Tennessee law ensures fundamental fairness in termination proceedings by requiring a heightened standard of proof—clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1); *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016). In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, "as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements" necessary to terminate parental rights. *Id.* In this regard, clear and convincing evidence is

"evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence" and which "produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established." *In re Alysia S.,* 460 S.W.3d 536, 572 (Tenn. Ct. App. 2014) (internal citations omitted). The Tennessee Supreme Court has further explained:

> The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 524.

## IV. ANALYSIS

### A. Grounds for Termination

#### 1. Grounds Not Challenged on Appeal

Mother concedes that clear and convincing evidence was presented to establish two of the four grounds on which her rights were terminated: abandonment by engaging in conduct prior to her incarceration that exhibited a wanton disregard for the Child's welfare of the child[5] and severe child abuse.[6] We have reviewed the testimony and

---

[5] Tennessee Code Annotated section 36-1-113(g)(1) provides that abandonment of the child by the parent, as defined in section 36-1-102, is a ground for termination; in turn, section 36-1-102(1)(A)(iv) defines abandonment, in pertinent part, as follows:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has failed to visit or has failed to support or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or *the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.*

(Emphasis added.) Mother was initially incarcerated from January 12, 2018 until mid-April 2018, when she was released; as a result of violating her probation, she was reincarcerated from May 9, 2018 through April 23, 2019.

[6] Tennessee Code Annotated section 36-1-113(g)(4), as it appeared on the date the petition was filed, states that parental rights may be terminated when he or she "[has been found to have committed severe

exhibits presented in this case and conclude that Mother's candid testimony about her drug usage, especially around her children, and criminal activity, coupled with the testimony of Ms. Mueller regarding the same, as well as the findings in the dependency and neglect proceeding and finding of severe child abuse, detailed above, constitute clear and convincing evidence establishing the ground of abandonment by engaging in conduct prior to her incarceration that exhibited a wanton disregard for the Child's welfare. The order finding that the children were the victims of severe child abuse, coupled with Mother's testimony regarding the same, also detailed above, constitute clear and convincing evidence establishing the ground of severe child abuse. We therefore affirm the trial court's holdings with respect to those two grounds, and proceed to review the grounds Mother contests.

### 2. Abandonment by Failure to Provide a Suitable Home

Tennessee Code Annotated section 36-1-113(g)(1) provides that abandonment of a child by the parent, as defined in section 36-1-102, is a ground for termination; in turn, section 36-1-102(1)(A)(ii), as worded when the petition was filed, defines abandonment as follows:

> (ii)(*a*) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;
> (*b*) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and
> (*c*) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an

child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child." In turn, section 37-1-102(b)(27)(A)(i) (2018), in effect when the petition was filed, defines "severe child abuse" to mean "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death.

early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

In this context, a "suitable home" means "'more than a proper physical living location'"; it must also "be free of drugs and domestic violence." *In re Billy T.W.*, No. E2016-02298-COA-R3-PT, 2017 WL 4317656, at *8 (Tenn. Ct. App. Sept. 27, 2017) (quoting *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014)).

The trial court's order relating to this ground states:

The testimony before the Court, and it is unrefuted, is that on January 12, 2018, the mother was arrested and found to be in possession of Methamphetamine. One of the children was also found to be in possession of drugs in a diaper bag. The second child was present in the car. Shortly after, the Court signed the protective custody order for both children and the mother was incarcerated. Although this Court agrees that it is difficult for a parent to do a lot while in jail, this mother had very specific tasks. The Department arranged for and paid for her to have mental health assessment, which mother completed. The Department arranged for her to have an alcohol and drug assessment, which the mother completed. The recommendations from those assessments were that she have eight hours of therapy, which she did. The Department of Children's Services paid for all of that while the mother was incarcerated.

Ms. Mueller, the foster care case manager, visited the mother while mother was in jail on several occasions. The Department made reasonable efforts in that first four months following removal; i.e. from January to April, 2018. And upon mother's release from incarceration, i.e. approximately 16 days after her release, she went back to using Methamphetamine and she was then back in jail. She did not maintain efforts to stay sober when she was released in April 2018. Mother had at least as much of an obligation to make efforts to reunify with her child(ren) as the Department did, but the Department's efforts exceeded the mother's efforts. The Department proved this Ground by clear and convincing evidence. The requirements of T.C.A. 36-1-113(g)(1) and 36-1-102(1)(A)(ii)(c) have been met by clear and convincing evidence.

Mother contends that DCS failed to introduce clear and convincing proof of its reasonable efforts to assist Mother; she argues that "[c]onsidering Mother's history of addiction, [offering her only eight hours of therapy while in jail] was barely more than a

token effort from DCS . . . to assist Mother in obtaining sobriety and establishing a suitable home upon her release from jail." She also contends that the court erred in "fail[ing] to consider Mother's more recent, positive behavior leading up to trial."

The Child was placed in DCS custody on January 12, 2018; consequently, the period to assess DCS's efforts is the four month period following January 12. During much of that time, Mother was incarcerated and DCS's ability to assist her was limited. DCS set up a drug and alcohol assessment, a mental health assessment, and eight hours of counseling, all of which Mother completed. The efforts were aimed at addressing Mother's drug addiction, a necessary component of establishing a suitable home; however, because of Mother's incarceration, DCS' efforts were not aimed at helping her secure a suitable physical location to reside with the Child. In *In re Eli S.*, this Court held that, because a mother's "incarceration prevented her from being able to make efforts to provide a suitable home and precluded DCS from assisting her in establishing a suitable home," the ground of abandonment by failure to provide a suitable home was not clearly and convincingly established. No. M2019-00974-COA-R3-PT, 2020 WL 1814895, at *11 (Tenn. Ct. App. Apr. 9, 2020) (citing *In re Jamel H.*, No. E2014-02539-COA-R3-PT, 2015 WL 4197220, at *7 (Tenn. Ct. App. July 13, 2015) (holding that "this ground is inapplicable . . . when [the child] was removed from [the other parent]'s care and when DCS admittedly could not assist Father in establishing a suitable home while he was incarcerated.")). The facts in this case warrant the same conclusion with respect to this element of abandonment.

As we consider whether Mother demonstrated a lack of concern for the Child such that was unlikely that she would be able to provide a suitable home at an early date, we "may consider the parents' more recent behavior." *In re Billy T.W.*, 2017 WL 4317656, at *9 (quoting *In re Kayla B.*, No. E2016-01192-COA-R3-PT, 2017 WL 438622, at *7 (Tenn. Ct. App. Feb. 1, 2017)). Mother was released from incarceration during the four month period; after a couple of weeks, however, she relapsed and violated her probation by testing positive for drugs, as a result of which she was reincarcerated. This behavior demonstrated a lack of proper concern for the Child and rendered her unable to provide a suitable home at that time. As more fully detailed hereinafter, following her release from incarceration and as a result of her participation in Blount County Recovery Court and in a residential recovery program called House of Awakenings, Mother has been sober and has plans to move in with her grandmother or get an apartment with the assistance of the director of House of Awakenings. Although DCS argues in its brief that "Mother planned to return to a residence where there was a history of domestic violence with [her father]," DCS does not cite to evidence in support of this contention; the evidence in the record is neither clear nor convincing that Mother's grandmother's home is a place of domestic conflict or drug usage.

In sum, the evidence as to this ground leads us to conclude that Mother's incarceration prevented DCS from assisting her in establishing a suitable home, and that,

considered in its entirety and in context, her behavior did not clearly and convincingly demonstrate a lack of concern for the Child such that Mother would not be able to provide a suitable home after she completes the program at House of Awakening. Accordingly, we hold that this ground was not clearly and convincingly established and reverse the trial court's holding in this regard.

### 3. Failure to Manifest an Ability and Willingness to Assume Custody

As respects this ground of termination we first address Mother's contention that she was not put on notice that DCS sought to terminate her rights on this ground and that, as a consequence, the termination of her rights on this ground should be reversed. In this regard, she correctly observes that the Petition alleged "Failure to Manifest, T.C.A §§ 36-1-113(g)(14)" only with respect to Father. At the beginning of the trial, however, counsel for DCS announced that it was pursuing termination of Mother's rights on this ground as well. Mother, represented by counsel, did not object at the time and proceeded with the trial; at no point during the trial did Mother object to any testimony or other proof offered with respect to this ground on the basis that she was unaware that it was being alleged against her. Accordingly, we conclude that this ground was tried by consent and that any issue of lack of notice to Mother has been waived. *In re Alysia S.*, 460 S.W.3d 536, 564 (Tenn. Ct. App. 2014) ("A ground for termination not included in the petition can be properly found if the ground was tried by implied consent."); *Black v. Blount*, 938 S.W.2d 394, 403 (Tenn. 1996) ("Under Tennessee law, issues raised for the first time on appeal are waived.").

We also address Mother's contention that the ground should be reversed because the court cited the incorrect section of the statute governing this ground for termination. The order states:

> Ground VI — Failure to Manifest ability to parent (Applies to Respondent/mother, Amanda P[.])
>
> By mother's own testimony she has stated that where she is living now is not an appropriate place for Ally to live. Furthermore, the history of this case and the history of her life demonstrate that mother cannot and has not demonstrated an ability to assume the legal and physical custody of Ally because the child has been moved from door to door, from house to house. Mother has resided with different relatives. She has lived in different places all the while with an ongoing substance abuse problem. Although mother is now ninety some odd days out of incarceration and although she is sober today probably for the first time in her memory, there has been nothing demonstrated to the Court that she is able to assume legal and physical custody. Furthermore, this Court finds that placing Ally in her care at this juncture would pose a substantial risk of harm to her physical and

- 13 -

psychological welfare. Not only would it be detrimental to Ally to remove her from the home of people she also regards as "Mommy" and "Daddy," but there is no proof that mother would be able to maintain sobriety for any length of time. Mother has no suitable housing; she has not provided any support for this child other than a pair of shoes. By clear and convincing evidence, the requirements of Tenn. Code § 36-1-113(g)(9) have been met[.]

The statute cited by the court is incorrect; subsection 113(g)(9) deals with putative fathers and is not applicable to Mother. However, the heading "Failure to Manifest [an] ability to parent" makes clear that the court's reference to the subsection (9) was a scrivener's error and does not adversely affect the integrity of the holding. It is apparent from both the oral ruling and the order entered that the intended reference was to section 36-1-113(g)(14), which provides that a parent's rights may be terminated where:

[a] parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Accordingly, we proceed to examine the evidence.

This ground requires the party seeking termination of a parent's rights to prove two elements by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1), (g)(14). First, the party must prove that the parent failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). Second, the party must prove that placing the children in the parent's "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). With respect to the second element of this ground, substantial risk of harm, we are guided by the holding in *Ray v. Ray*:

The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted).

- 14 -

This court has not reached consensus with respect to the manner in which the statute is to be interpreted in establishing the first element of this ground, as noted in *In re Zaylee W.*:

> There is a split in authority regarding the proof required to establish the first prong of the analysis. In *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *12-15 (Tenn. Ct. App. June 20, 2018), a panel of this Court addressed the first prong by engaging in a complicated use of statutory construction and grammar rules to essentially conclude that the General Assembly's use of "and" in the phrase "an ability and willingness" actually means "or." Some panels of this Court have followed the decision in *In re Amynn K.* and concluded that a party is not required to prove a failure to manifest both a willingness and an ability to assume responsibility of the child. *See In re Jayda H.*, No. E2019-00855-COA-R3-PT, 2019 WL 6320503, at *9 (Tenn. Ct. App. Nov. 25, 2019) (stating that "consistent with the discussion in the *In re Amynn K.* decision, we do not view a parent's demonstration of 'willingness' as fatal to this ground when accompanied by a failure to manifest the requisite 'ability' "); *see also In re Nevaeh B.*, No. E2019-01539-COA-R3-PT, 2020 WL 1527001, at *10-12 (Tenn. Ct. App. Mar. 26, 2020); *In re Serenity S.*, No. E2019-00277-COA-R3-PT, 2020 WL 522439, at *16 (Tenn. Ct. App. Jan. 31, 2020).

> In *In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018), a panel of this Court interpreted "and" as requiring a party to prove that a parent failed to manifest both an ability and a willingness. Under this interpretation, if a party proves only the "ability" criterion or the "willingness" criterion, the requirements of the statute are not met, and this ground may not serve as a basis for terminating parental rights. *Id.* We believe the interpretation found in *In re Ayden S.* is more consistent with the intent of the General Assembly.

> Applying the interpretation in *In re Ayden S.*, Petitioner must prove by clear and convincing evidence that Father failed to manifest *both* an ability and willingness to personally assume legal and physical custody of the child or that he failed to manifest an ability and willingness to personally assume financial responsibility for the child. When evaluating ability, we focus "on the parent's lifestyle and circumstances." *Id.* "When evaluating willingness, we look for more than mere words." *Id.* Rather, a parent must have demonstrated willingness "by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child." *Id.*

No. M2019-00342-COA-R3-PT, 2020 WL 1808614, at *5 (Tenn. Ct. App. Apr. 9, 2020).

Following the framework set forth in *In re Ayden S.*, we first examine the record for evidence that Mother failed to manifest both an ability and willingness to personally assume legal and physical custody of the Child. Mother testified that her current efforts to address and recover from her history of drug abuse are intense and require that she live in a trailer with other recovering addicts; this living situation prevents her from having the present ability to take physical custody of the Child. We agree with the trial court that there is no evidence in the record that Mother is able to assume custody of the Child.

As to Mother's willingness to assume physical and legal custody, Mother testified that she was actively participating in the program to address her drug addiction, which is the reason the Child came into DCS custody. Mother agreed that her current living situation is not suitable for a child but testified that she plans to move in with her grandmother or get an apartment after she completes the program. This testimony shows that Mother was willing to take custody of the Child in the future but did not presently have, and would not have for at least three months, the ability to take physical custody of her. DCS' burden was to prove that Mother failed to manifest both elements and, while her inability to assume custody was clear, and DCS failed to prove that Mother was not willing to assume custody. Accordingly, we conclude that there is not clear and convincing evidence supporting termination of Mother's parental rights on this ground and reverse the trial court's holding.[7]

Having determined that at least one ground for termination was established by clear and convincing evidence, we proceed to consider whether termination was in the Child's best interest.

## B. Best Interest Determination

Once a ground for termination has been proven by clear and convincing evidence, the trial court must determine whether it is in the best interest of the child for the parent's rights to be terminated, again using the clear and convincing evidence standard. *In re Valentine*, 79 S.W.3d at 546. The Legislature has set out a list of factors at Tennessee Code Annotated section 36-1-113(i) for the courts to follow in determining the child's best interest. The list of factors in the statute "is not exhaustive, and the statute does not

---

[7] Although we do not reach the second element of this ground, substantial risk of harm, we note that a history of criminal activity and repeated incarcerations, prompted by the violation of probation, is strong evidence of a "real hazard or danger that is not minor, trivial, or insignificant." *See In re O.M.*, No. E2018-01463-COA-R3-PT, 2019 WL 1872511, at *4 (Tenn. Ct. App. Apr. 26, 2019) (holding that "placing a child with a parent who ha[s] knowingly engaged in repeated criminal conduct that necessitated [the parent's] re-incarceration would place the child at risk of physical or psychological harm.") (quoting *In re Amynn K.*, 2018 WL 3058280, at *15).

- 16 -

require every factor to appear before a court can find that termination is in a child's best interest." *In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *Tenn. Dept. of Children's Svcs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)). The Tennessee Supreme Court has explained:

> Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.,* 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child...." Tenn. Code Ann. § 36-1-101(d) (2017).

*In re Gabriella D.*, 531 S.W.3d 662, 681–82 (Tenn. 2017).

The trial court discussed each factor at Tennessee Code Annotated section 36-1-113(i) and assessed in whose favor many of the factors weighed:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the best interest to be in the home of the parent or guardian;

> There has not been such an adjustment of circumstances. Mother is sober but she resides in a halfway house. Her recovery is new and she is only in phase II of this program. The adjustment of circumstances has not happened during almost the entirety of the time that [the Child] has been in foster care for almost 15 months. Mother's changes for the better have only been in the last couple of months. There has not been such an adjustment of circumstances that would make it safe for [the Child] to return home.

> (2) Whether the parent has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

Yes, there were limits as to what the Department could do, but the Department did do what it could to assist the mother. In all frankness, the mother 'threw it in their faces' when the mother went out and resumed her drug use in April 2018. There has been no duration of lasting adjustment. It does not appear possible because we have not had a period of sobriety longer than that for which mother is living now.

(3) Whether the parent has maintained regular visitation or other contact with the child;

Mother did not maintain regular visits with [the Child] until her release from incarceration. Due to the restrictions associated with mother being incarcerated, this Court will not find that this weighs in favor of the Department or the mother.

(4) Whether a meaningful relationship has otherwise been established between the parent and the child;

This Court finds that the mother does have a meaningful relationship. Ms. Baker testified that mother was enthusiastic to see the child and her sibling and that the children were enthusiastic to see her. [The Child] refers to the mother as "Amanda" and also calls her "Mommy." The Court finds that this factor does weigh in the mother's favor.

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

The testimony is unrefuted that [the Child] is very bonded to her foster parents. She is very bonded to Mr. H[.] who is the father of [the Child's] sister, B.H. [The Child] has a very strong relationship with that sister as well. [The Child] refers to foster parents as "Mommy" and "Daddy." The Court finds that this factor does weigh in favor of the Department.

(6) Whether the parent . . . has shown brutality, physical . . . abuse toward the child, or another child or adult in the family or household;

This Court has received a certified copy of the severe abuse order and has already address[ed] this in Ground V of this Petition. The Court finds that this factor weighs in favor of the State.

(7) Whether the physical environment of the parent or guardian's home is healthy and safe . . . ;

- 18 -

The mother's home is inappropriate. Prior to mother's incarceration and the home she intends to return to is the site of domestic abuse and substance use.

[(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child;]

There was no testimony regarding the mother's mental status and the Court, accordingly, does not address that factor.

(9) Whether the parent has paid child support consistent with the child support guidelines promulgated by the department pursuant to 36-5-101.

Mother has provided shoes and some snacks. Otherwise this factor weighs in favor of the State because that is not consistent with the guidelines.

Mother does not challenge any of the above findings as being unsupported by the evidence, and upon our review of the record, we conclude that the findings are supported by the testimony and exhibits.[8] Mother argues that the meaningful relationship that the court found existed between her and the Child "should have received the most weight in the court's analysis of the best interest factors."

In our resolution of this decision, we are guided by the following instruction from *In re Gabriella D.*:

> A trial court's determination as to whether facts amount to clear and convincing evidence supporting termination of parental rights is a conclusion of law. Id. (citing *In re M.L.P.*, 281 S.W.3d at 393). Thus, an appellate court reviews this determination de novo, affording no deference

---

[8] With respect to the finding as to factor (7), we previously noted in this opinion that the evidence in the record is not clear that Mother's grandmother's home, which Mother testified was an option for her to move into after completing the treatment program, was a place of domestic conflict or drug usage. However, we review this finding under a different standard of review and, given the close proximity of that home to Mother's father's home and also to the foster father's home, as well as ample testimony that Mother used drugs regularly since 2011, which would include the time she lived with her grandmother, we cannot conclude that the evidence preponderates against this particular finding.

Similarly, with respect to factor (8), the trial court found that "[t]here was no testimony regarding mother's mental health status." Various exhibits at trial reference Mother's mental health needs, but there was no evidence clearly establishing what those needs were, whether they still existed at the time of trial, or that they were detrimental to the Child or would prevent Mother from providing safe and stable care and supervision.

to the trial court's decision, and makes its own determination as to whether the facts amount to clear and convincing evidence of the elements necessary to terminate parental rights. Id. (citing *In re Bernard T.*, 319 S.W.3d at 596-97). The dispositive issue in this appeal is a question of law: whether the facts presented amount to clear and convincing evidence that termination of Mother's parental rights is in the best interests of the children.

531 S.W.3d at 680. Measured against this standard, we conclude that the facts presented do not satisfy the heightened standard of proof to allow us to conclude that termination of Mother's parental rights is in Allyson's best interest.

This is not an easy determination by any means. Pertinent to this inquiry, with respect to statutory factors (1) and (2), the trial court found that Mother's behavior following her 2018 release from incarceration, which resulted in her reincarceration and the positive adjustments in her circumstances which had taken place in the few months since her release from incarceration and participation in the residential program, did not establish the "adjustment of circumstances, conduct or conditions" as contemplated by the statute, and weighed both factors against her. The court found that Mother does have a meaningful relationship with the Child, and that the child has bonded with the foster parents, one of whom is the father of the Child's half-sister. One factor which was not discussed by the court is the effect of Mother's continued participation in and the supervision and guidance available through the Blount County Drug Court. At the time of trial, Mother was five months into the two-year program, and the record contains a positive letter from the Drug Court program director stating that mother "appears dedicated and consistent working for her recovery and to be a productive citizen in her community."

The primary goal in both permanency plans, one of which was developed after Mother's relapse and reincarceration, has been to return the Child to Mother. The tasks assigned to Mother in the plans were intended to address the situation that brought the Child into DCS custody — Mother's addiction and related behavior; the record shows that, other than the incident that resulted in her reincarceration, Mother has been on track since then and done everything DCS and the Recovery Court have required. We do not discount the fact that the Child has been in foster care for over a year and has bonded with the foster family; those are facts that make this a difficult decision for this court and, we are confident, the trial court. Our conclusion that the combined weight of the factors does not result in clear and convincing proof that termination of Mother's rights is in the Child's best interest is consistent with the following statement in *In re Gabriella D.*:

By so holding, we do not at all condone or excuse the conduct that resulted in the removal of these children from Mother's custody. . . .And we certainly do not minimize the genuine concern and affection Foster

Parents have for these children. Our decision instead results from an objective and comprehensive review of the record to determine whether the facts presented satisfy the constitutionally mandated heightened standard of proof. This heightened standard is designed specifically to reduce the risk of erroneous decisions depriving parents of their precious and fundamental rights to the care and custody of children. In this case the heightened standard was not satisfied. . . . The proof in this case established that Mother has been able to make the necessary adjustments. This is precisely how the system is designed to function. Should Mother revert to the reprehensible conduct that started the process that culminates with this decision, DCS will have the option of filing a termination petition, and the circuit court's finding of severe abuse has not been disturbed on appeal.

531 S.W. 3d at 686.

## V. CONCLUSION

For the foregoing reasons, we affirm the holdings that the evidence clearly and convincingly establishes the grounds of abandonment by engaging in conduct prior to incarceration that exhibited a wanton disregard for Allyson's welfare and severe child abuse; we reverse the grounds of abandonment by failure to provide a suitable home and failure to manifest an ability and willingness to assume custody, and the holding that termination of Mother's parental rights is in Allyson's best interest. Accordingly, we reverse the judgment terminating Mother's rights and remand the case for entry of an order dismissing the petition.

RICHARD H. DINKINS, JUDGE